(55 Misc. Rep. 420)

### RING v. RING.

(Supreme Court, Special Term, Westchester County. July 6, 1907.)

1. DEEDS—FRAUD—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE.

   In an action to cancel a deed, evidence *held* sufficient to justify cancellation on the ground of fraud and undue influence.

2. CANCELLATION OF INSTRUMENTS—CONDITIONS PRECEDENT—INABILITY TO PLACE DEFENDANT IN STATU QUO.

   Where a defendant obtained a deed from plaintiff by fraud and undue influence, a part of the consideration for which was the marriage of the parties, the fact that defendant cannot be placed in statu quo will not prevent a cancellation of the deed.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Cancellation of Instruments, § 32.]

Action by Naomi Duncombe Ring against Patrick J. Ring for the cancellation of a deed and an accounting, etc. Judgment for plaintiff as prayed.

Mills & Johnson, for plaintiff.

Wm. L. Snyder, for defendant.

TOMPKINS, J. The plaintiff is entitled to the relief asked for in the complaint. The deed sought to be adjudged fraudulent and void was executed on the 3d day of September, 1904. At that time the plaintiff was 64 or 65 years of age and a widow, while the defendant was 40 years of age. On the 10th day of September, 1904, the plaintiff and defendant were married, pursuant to an agreement made at the time of the execution of the said deed, which agreement is referred to in the deed and is stated as a part of the consideration therefor. They never, however, cohabited as husband and wife. For several years prior to the execution and delivery of the deed in question the defendant had acted as the plaintiff's confidential agent and business manager, renting her property, collecting the rents therefor, looking after the repairs, and advising and assisting her in several lawsuits, during all of which time he had his meals at the plaintiff's home free

of charge, and frequently spent the evening there in her company. In 1902 the defendant induced the plaintiff to commence the erection of an opera house upon certain lands owned by her in the city of Mt. Vernon. Defendant undertook the management of the building operations, made the contracts, employed the men, paid for labor and materials, and had entire charge of the construction of the new opera house. Substantially all of the money that went into that venture was provided by the plaintiff.

True, the defendant claims to have used large sums of money in the building, but failed to establish that claim upon the trial. He never had more than $500 or $600, at the most, of his own money, and it is doubtful whether that went into the new building. Prior to September, 1902, the defendant from time to time rendered written statements to the plaintiff, showing the rents received by him as her agent and the disbursements made for repairs, etc., and stating the amount of his commission, which was 5 per cent. upon the gross rents collected, and striking a balance, which statement showed that the defendant paid himself his 5 per cent. commission out of the plaintiff's rent; and such a statement, bearing date June 5, 1902, shows a balance claimed to be due the defendant from the plaintiff of $18.24. After September, 1902, and while the work upon the new opera house was in progress, the defendant failed to render any account of his receipts and disbursements of the plaintiff's moneys, and I find as matters of fact that, at the time of the execution and delivery of the deed in question, plaintiff was not indebted to the defendant in any amount, and that the entire cost of the opera house, and the property described in and sought to be conveyed by the deed in question, was paid by the plaintiff.

For some years prior to the execution of the deed, the defendant had been poisoning the plaintiff's mind against her daughter, who had for many years been in poor health, and on that account was living in New Mexico, and her granddaughter, who resided in the plaintiff's home from childhood, and during most of the time until March, 1904, at which time defendant succeeded in persuading the plaintiff to drive her granddaughter, Mrs. Valentine and her husband, from her home, and from that time until after the deed was executed the plaintiff and her granddaughter, Mrs. Valentine, were separated and apart, as a result of the efforts made by the defendant to antagonize them. For several months prior to the execution of the deed, the defendant, while practically living at the plaintiff's home, and in full charge of the opera house property and the building operations upon that property, and having exclusive charge of all of the plaintiff's other property, and handling practically all of her money, and acting as her confidential adviser, insisted from time to time that the plaintiff was indebted to him in large sums of money, although he never rendered a statement or claimed any particular amount, and that unless she would deed to him the opera house property, or an interest therein, he would abandon the work on the new opera house and would sue her for a large sum of money. These threats were repeated from time to time, and finally resulted in the preparation and execution of the deed in question.

Defendant stated to two of the plaintiff's witnesses that his purpose in securing the removal of the Valentines from the plaintiff's house was so that he could do what he pleased with the "old lady." It also appears from the testimony of the plaintiff's son-in-law, McClellan, who was on friendly terms with the plaintiff, that the defendant had so much influence over her in 1902 that he persuaded her to construct the new opera house against the advice of her son-in-law. From the confidential relations existing between the plaintiff and defendant, and the controlling influence which the defendant seemed to possess over the plaintiff, the difference in their ages, the threats, coercion, and influence testified by the plaintiff to have been made and exercised over her by the defendant, and the absence of any valuable consideration, I find that the deed was not the free and voluntary act of the plaintiff, but was procured from her by the defendant by means of fraud, coercion, threats, and undue influence.

The giving away of a valuable interest in her property, without any valuable consideration, was the foolish act of an old woman, who was at that time completely under the influence and control of the defendant. That the defendant's will overruled and controlled the mind of the plaintiff was manifested by what followed between them, immediately after plaintiff commenced the first action to set aside this deed. As soon as defendant learned from public print that the action had been commenced, he found the plaintiff and succeeded in persuading her to discontinue the action, and then took her to a lawyer who had never been her attorney, and in the absence and without the knowledge of her own attorneys obtained from her an affidavit designed to support the validity of the deed. All that followed the commencement of the first action, in respect to its discontinuance, tends to support the theory that, while plaintiff was alone in defendant's presence, she was dominated and controlled by him.

The defendant's counsel argues with much earnestness and ability that the deed in question is a "nuptial deed," and does not involve the questions which usually arise in relation to antenuptial or postnuptial agreements. He contends that it was the marriage, and the marriage alone, that gave force and validity to the deed, and that as long as the marriage stands the deed must stand. The deed contains the following recital:

Whereas, it is intended and agreed by and between the said parties that they shall within three months of the date of the execution of these presents become husband and wife, and in consideration of said marriage, and of divers good, valuable, and adequate considerations, it has been mutually agreed that the land shall be conveyed, and that the conveyances hereafter set forth shall be executed, delivered, and have full force and effect."

My conclusion from the whole case is that the marriage was simply a part of defendant's scheme to obtain the plaintiff's property, and that his agreement to marry her, and the subsequent consummation of that agreement, were all in furtherance of his fraudulent purpose.

While it is a general rule that a party, endeavoring to avoid an agreement or contract on the ground of fraud, should restore to the other party everything he has received in the execution of it, still this is not necessary in case it is impossible to do so by reason of the lat-

ter's act in the prosecution of his fraudulent purpose. Hammond v. Pennock, 61 N. Y. 145; Guckenheimer v. Angevine, 81 N. Y. 394. It is impossible for the plaintiff to restore the defendant to his former freedom and release him from the legal bond of matrimony; but that can be no reason for the refusal by a court of equity to restore to the plaintiff the property that has been fraudulently obtained from her. No matter what the agreement contained in the deed, with respect to the deed and marriage, may be called, if it has its inception in fraud, and the conveyance of the property was induced by fraud and improper influence, a court of equity should not hesitate to set it aside. An agreement conceived in fraud should not be upheld against the innocent party, simply because the one who perpetrated and profited by the fraud may not be restored to his former position; and the fact that the wrongdoer may suffer the loss of his former position will not deter equity from granting relief to the injured and innocent party.

The plaintiff is entitled to a judgment adjudging the deed to be fraudulent and void, and canceling it of record, and requiring the defendant to account for the rents, use, and income thereof; with costs.